UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Nikos Kidis,

    Plaintiff,

v.                                       Case No. 16-13070

John Moran,                        Sean F. Cox
                                              United States District Court Judge

    Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR REMITTITUR OR A NEW TRIAL (ECF No. 125)

In this §1983 excessive-force case, a jury returned a verdict in favor of Plaintiff Nikos Kidis and against Defendant John Moran. Moran now moves for a remittitur or, in the alternative, a new trial. Because the Court concludes that oral argument will not aid the decisional process, the motion will be decided on the parties' briefing. E.D. Mich. LR 7.1(f)(2). For the reasons below, the Court will deny the motion.

### BACKGROUND[1]

On August 31, 2014, Plaintiff Nikos Kidis attended a Labor Day Festival in Hamtramck, Michigan. Trial Tr. vol. 3, 12:5-11. He drank approximately ten to twelve beers over the course of five to eight hours. *Id.* at 12:21-13:2. After these drinks, Kidis got behind the wheel of his car and began driving home. *Id*. at 13:6-7. Kidis was shirtless with jean shorts and running shoes. *Id*. at 15:6-7.

---

[1]Although Moran presented a different version of the facts, the Court outlines the facts as the jury was entitled to find them, based on the evidence admitted at trial.

1

On his drive home, Kidis sideswiped another car. *Id.* at 14:5-10. Kidis "got all excited" and fled the scene. *Id.* at 14:15-18. Kidis testified that he did not sustain any physical injuries during the car crash. *Id.* at 14:19-15:1.

As he was fleeing, Kidis encountered City of Warren Police Officer Jean Reid, who was responding to the scene of the crash. *Id.* at 15:9-11. Officer Reid asked him to stop and he did. *Id.* at 15:15-21. Reid questioned him about the crash and began handcuffing him. *Id.* at 16:2-7. After Reid had secured a handcuff on his left hand, Kidis pulled away from her, momentarily lost his balance, and took off running. *Id.* at 17:3-8.

Kidis ran through "the parking structure of a building," and jumped two six-foot barbed-wire fences. *Id.* 18:3-19:16. After the second fence, Kidis continued running "for a minute or two," through a wooded area, before his shoes fell off. *Id.* at 19:18-19:21. Tired and unable to bear the loss of his shoes, Kidis "gave up" by laying "on his stomach with [his] hands out." *Id.* at 19:23-25. During his flight, Kidis suffered "scratches" on the palms of his hands (from the barbed-wire fences) and on his shirtless chest and stomach (from running through the brush of the wooded area). *Id.* at 20:6-16.

At this point, Warren Police Officer John Moran caught up with Kidis. He "got on top" of Kidis and "gave [him] knee thrusts." *Id.* at 21:6-7. Moran then "put his hands around [Kidis's] neck and started choking [him]." *Id.* at 21:7-8. Moran proceeded to punch him in the head and eye and continued to strangle him. *Id.* at 22:1-2. Kidis estimated that Moran punched him "two to seven times." *Id.* at 22:13-15. During the beating, Moran said, "We're going to teach you for running, motherfucker. We're going to get you." *Id.* at 23:5-9.

During the beating, Kidis did not resist or attempt to fight back. *Id.* at 21:21-24.

2

After Moran handcuffed Kidis, two other officers arrived on the scene and escorted Kidis to a police car. *Id*. at 23:19-21. Kidis's body was "limp" from the beating, so the officers had to drag him to the car. *Id*. at 21-22.

After the incident, Kidis went to a chiropractor, complaining of "headaches, shooting head pain, face twitch, depression, dizziness, loss of balance, ringing in ears, blurred vision, muscle spasm in his neck, grinding in his neck, tight shoulders and arms, pins and needles in his arms and hands, numbness in the arm and hand, mid-back pain, nerves, nervousness, sleeping problems, and pain in his leg or feet." (ECF No 136-4, PageID 5354). Kidis was diagnosed with cervical segmental dysfunction, thoracic subluxation, lumbar subluxation, and pelvic subluxation. (ECF No. 136-4, PageID 5356). In other words, "there [were] areas throughout the spine that were out of place causing dysfunction." *Id.*

Kidis testified that he continues to suffer pain because of his spinal issues, Trial Tr. vol. 3, 27:22-23, and has psychological problems, "kind of like PTSD." *Id*. at 29:8-9.

On August 24, 2016, Kidis filed this lawsuit against Moran and Reid, alleging one count of excessive force against each officer. On November 20, 2017, Reid and Moran filed a motion for summary judgment. In response to this motion, Kidis asserted an additional claim of deliberate indifference against the officers.

On April 23, 2018, the Court granted in part, and denied in part, the Defendants' motion for summary judgment. The Court concluded that, because there was no evidence that Reid was present during the arrest, she could not be liable for excessive force. The Court also considered the deliberate indifference claims and concluded that, because there was no evidence that either Reid or Moran knew of Kidis's injuries and declined to assist him, they were entitled to summary

3

judgment on those claims. (ECF No. 57, PageID 1276).

The Court also concluded that Kidis had offered evidence upon which a reasonable jury could conclude that Moran's use of force was objectively unreasonable. The Court therefore rejected Moran's argument that he was shielded by qualified immunity. Moran did not file an interlocutory appeal on the issue of qualified immunity.

On October 17, 2018, a jury trial commenced in this case. At the close of Kidis's proofs, Moran did not move for judgment as a matter of law or for a directed verdict. (ECF No. 125-2, PageID 4442).[2] On October 25, 2018, the jury returned a verdict in favor of Kidis. The jury awarded $1 in nominal compensatory damages and $200,000 in punitive damages. Now, Moran moves for a remittitur or new trial, arguing that the jury's award of $200,000 in punitive damages is excessive and that he is entitled to qualified immunity.

## ANALYSIS

**I.     Punitive Damages**

The Court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). The Sixth Circuit has interpreted this rule "to require a new trial only when a jury has reached a 'seriously erroneous result' as evidenced by (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Mike's Train House, Inc. v. Lionel*, *L.L.C*. 472 F.3d 398, 405 (6th Cir. 2006). Here, Moran argues that the $200,000 punitive damages award is so

---

[2]Notably, the Court specifically asked Moran's counsel if he would be moving for a directed verdict. Defense counsel stated that he would not be. (ECF No. 125-2, PageID 4434).

excessive as to violate his due process rights.

"Whether a punitive damages award is so excessive as to offend due process depends on [the Court's] assessment of the 'three guideposts' first enunciated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)." *Romanski v. Detroit Entertainment, L.L.C.*, 428 F.3d 629, 643 (6th Cir. 2005). These three guideposts are (1) the degree of reprehensibility of the defendant's conduct, (2) the punitive award's ratio to the compensatory award, and (3) sanctions for comparable misconduct. *Id.* (citing *Gore*, 517 U.S. at 576-84).

### A.  Reprehensibility

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. In considering the degree of reprehensibility of Moran's conduct, the Court will consider whether (a) the harm caused was physical as opposed to economic; (b) the tortious conduct evidenced an indifference to or a reckless disregard of the health and safety of others; (c) the target of the conduct had financial vulnerability; (d) the conduct involved repeated actions or was an isolated incident; and (e) the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

Here, the jury found that Moran had used excessive force in arresting Kidis. Although the jury concluded that Kidis had not satisfied his burden to show that Moran's conduct caused actual damage, including Kidis's purported spinal issues, it did conclude that Kidis was entitled to punitive damages. (ECF No. 111). The Court had instructed the jury that punitive damages may be awarded if it found that Moran had acted "recklessly and callously indifferent to [Kidis's] constitutional rights." (ECF No. 109, PageID 3531).

5

Based on the verdict form and the evidence introduced at trial, the jury must have concluded that Moran unnecessarily choked and/or beat Kidis during the arrest. These acts of physical violence are at the very top of the "hierarchy of reprehensibility." *See McCoy v. Alfrey*, 2010 WL 4366120 at *4 (E.D. Ky. 2010) (citing *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001)). Moreover, this beating and choking was intentional and evidenced a reckless disregard for Kidis's health and safety. Thus, the first *Gore* factor favors a substantial award of punitive damages.

B. **Ratio Between Compensatory Damages and Punitive Damages**

Moran notes that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 408. However, the Supreme Court's jurisprudence on ratios is of limited relevance in § 1983 cases when the plaintiff was awarded nominal compensatory damages for a constitutional violation. *See Arnold v. Wilder,* 657 F.3d 353, 370 (6th Cir. 2011) ("We have held, however, that the Supreme Court's cases on the ratio component of the excessiveness inquiry—which involved substantial compensatory damages awards for economic and measurable noneconomic harm—are...of limited relevance in § 1983 cases where the basis for the punitive damages award was the plaintiff's unlawful arrest and the plaintiff's economic injury was so minimal as to be essentially nominal.") (citing *Romanski*, 428 F.3d at 645); *See also Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1121 (9th Cir.2008) (upholding a 125,000 to one ratio in a § 1983 case and concluding that "[r]atios in excess of single digits in § 1983 suits...will not generally violate due process when the victim suffers no compensable injury")[3]; *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1016 (5th Cir.2003)

---

[3]In *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1058 (9th Cir. 2014), the Ninth Circuit went a step further by stating, "because nominal damages measure neither damage nor severity of conduct, it is not appropriate to examine the ratio of a nominal damages award to a punitive

6

("[A]ny punitive damages-to-compensatory damages 'ratio analysis' cannot be applied effectively in cases where only nominal damages have been awarded, such as the § 1983 suit before us."); *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir.1996) ("In *Gore*, a 500 to 1 ratio was 'breathtaking.' However, in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration.").

Although Moran is correct that, at first glance, the 200,000 to 1 ratio in this case seems suspect, it is not dispositive of the excessiveness inquiry because this is a § 1983 case with nominal damages. Any substantial punitive damages award will exceed a single-digit ratio. Thus, the excessiveness determination will turn on other factors.

### C. Sanctions for Comparable Misconduct

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore*, 517 U.S. at 583. "The purpose of this guidepost reflects an elementary principle of due process—namely, that the defendant must have been provided 'fair notice' that its conduct would subject it to a penalty on the order of the punitive damages award." *Romanski*, 428 F.3d at 648. "Notice of possible penalties is not to be confused with notice of the unlawfulness of the underlying conduct; the latter is irrelevant to the constitutionality of a punitive damages award." *Id*.

In his motion, Moran cites seven § 1983 cases where the plaintiffs received between $1,000 and $40,000 in punitive damages. (ECF No. 125, PageID 4411-4415). However, most of these cases do not involve acts of physical violence—in fact, some even expressly distinguish themselves from

---

damages award." The Ninth Circuit noted that *Mendez* arose under a different statutory scheme, but overruled it to the extent it conflicted with *Arizona*. *Id*. at n.1.

cases of excessive force. *See Martin v. Harris*, 842 F.2d 332 (6th Cir. 1988) (ordering remittitur to $10,000 in an unlawful search-and-seizure case because of "the absence of physical abuse or excessive force"); *Riley v. Kurtz*, 194 F.3d 1313 (6th Cir. 1999) (ordering remittitur to $1,000 in a First Amendment retaliation case, because "there [was] no allegation of physical abuse or excessive force"); *Wilson v. Wilkins*, 2012 WL 859579 at *4 (M.D. Tenn. 2012) (Mag. J. Bryant) (ordering remittitur to $7,500 in an unreasonable seizure case when there was an "absence of any violence, or threat of violence"); *Tate v. Donovan*, 2003 WL 21978141 at *8 (E.D. Penn. 2003) (upholding a jury's $10,000 punitive damage award in a First Amendment retaliation case and noting that emotional and psychological harms are more reprehensible than economic damages but "not equivalent to physical harm"); *Kerwin v. McConell*, 2008 WL 4525369 at *8 (W.D. Penn. 2008) (ordering remittitur to $7,500 in a First Amendment retaliation case); *Williams*, 352 F.3d at1016 (upholding a $15,000 per-plaintiff punitive damage award in an unreasonable search-and-seizure case). Because none of these cases deal with excessive force, they are of no value to the Court's inquiry as to whether Moran had 'fair notice' that his use of excessive force would subject him to a penalty on the order of $200,000.

In one of Moran's cited cases, the defendant used excessive force. *See Blackledge v. Carlone*, 126 F.Supp.2d 224 (D. Conn. 2001). However, in that case, the court merely concluded that the $40,000 award was not excessive. *Id*. at 231. It did not determine the maximum permissible punitive award.

The Court looks to other comparable cases, and finds *Payne v. Jones*, 711 F.3d 85 (2nd Cir. 2013) to be particularly helpful. In *Payne*, a police officer was called to a hospital to arrest a combative, mentally ill patient. While waiting for an ambulance to take the patient to a different

hospital, the officer "slapped" the side of the patient's head. *Id*. at 88. Once they arrived at the second hospital, the patient resisted the officer's efforts to take him to a room. *Id*. After the officer wrapped the patient in a bear hug, the patient kicked him in the groin. The officer reacted by "punching [the handcuffed patient] in the face and neck seven to ten times and kneeing him in the back several times." *Id*.

A jury concluded that the officer had used excessive force and committed a battery in violation of state law. *Id*. at 90. The jury awarded $60,000 in compensatory damages and $300,000 in punitive damages. *Id.*

On appeal, the United States Court of Appeals for the Second Circuit ordered remittitur of the punitive award to $100,000. The court found that significant factors mitigated the reprehensibility of the officer's conduct, including the patient's resistance and the kick to the groin. *Id*. at 101. The court also conducted a survey of excessive force cases, which showed that the court "had never approved a punitive award against an individual officer as large as the $300,000 award here":

> We have described awards ranging from $125,000 to $175,000 as "substantial," *King v. Macri*, 993 F.2d 294, 299 (2d Cir.1993), and we have ordered remittitur of awards as low as $75,000, *see id.* (reducing the award to $50,000); *see also DiSorbo v. Hoy*, 343 F.3d 172, 189 (2d Cir.2003) (reducing a $1.275 million award to $75,000); *Lee*, 101 F.3d at 813 (reducing a $200,000 award to $75,000); *King*, 993 F.2d at 299 (reducing a $175,000 award to $100,000). Moreover, in police misconduct cases in which we sustained awards around $150,000, *see, e.g., Ismail*, 899 F.2d at 187, the wrongs at issue were more egregious than the misconduct of [the officer here].

*Id.* at 104.

Other cases also shed light on the appropriate punitive damage award in police misconduct cases. In *O'Neill v. Krzeminski*, 839 F.2d 9 (2nd Cir. 1988), two police officers struck a handcuffed prisoner three times on his face and neck. One officer used a blackjack to strike one of the blows.

9

*Id.* at 10. The officers then dragged the prisoner by his throat across the detention area floor before they allowed him to be taken to the hospital, where he was treated for a fractured nose and lacerations to his forehead and eyebrow. *Id.* The Second Circuit affirmed punitive damages awards of $125,000 and $60,000 against the two officers. *Id.* at 13–14.

In *Ismail v. Cohen*, 899 F.2d 183, 186 (2nd Cir. 1990) a police officer struck the plaintiff in the back of the head following an argument over a parking citation. The plaintiff briefly lost consciousness. When he awoke, he found that the officer was pressing a gun against his head and a knee into his back. The plaintiff spent more than two days in jail and was later tried, and acquitted, on three criminal counts stemming from the parking citation dispute. *Id*. After the subsequent civil action, the district court determined that the jury's award of $150,000 in punitive damages was excessive. The Second Circuit disagreed, reinstating the award.

In *King v. Macri*, 993 F.2d 294, 299 (2nd Cir. 1993), court security officers punched the plaintiff repeatedly and used a choke-hold on him when they placed him under arrest. The plaintiff was strip-searched and sent to Rikers Island, where he was held for two months awaiting trial on criminal charges that included resisting arrest and disorderly conduct. All the criminal charges were either dropped prior to trial, dismissed by the state court, or resolved by a jury verdict of acquittal. *Id.* at 297. The Second Circuit reduced the jury's punitive awards of $175,000 and $75,000 against two of the officers to $100,000 and $50,000, respectively. *See id.* at 299.

In *Alla v. Verkay*, 979 F.Supp.2d 349 (E.D. N.Y. 2013), an officer punched the plaintiff one time during the course of an arrest. After the punch, the officer stated "That's how we do it." *Id*. at 358. A jury awarded $150,000 in punitive damages. The court declined to order remittitur because the award "reflects a comfortable middle ground between the awards approved in [other police

10

misconduct cases] and is, if anything, somewhat conservative." *Id*. at 379.

In *Butler v. Windsor*, 143 F.Supp.3d 332 (D.Md. 2015), the court upheld a punitive damages award of $100,000 on an excessive force claim when the officer tackled the plaintiff and repeatedly punched him in the face without provocation.

Thus, a review of comparable case law shows that a police officer who uses excessive force, like Moran, has fair notice of punitive damage awards on the order of $40,000 to $150,000. "However, the awards cited are significantly higher when adjusted for inflation." *Alla*, 979 F.Supp.2d at 375.[4] *O'Neill* (approximately $273,000 and $131,000 in 2018 dollars); *Ismail* (approximately $294,000 in 2018 dollars); *King* (approximately $166,000 in 2018 dollars); *Alla* (approximately $162,000 in 2018 dollars); *Butler* (approximately $106,000 in 2018 dollars); *Blackledge* (approximately $58,000 in 2018 dollars).[5]

Moreover, the Court concludes that Moran's conduct was more reprehensible than the two most factually similar cases, *Payne* and *Alla*. None of the mitigating factors from *Payne* was present in this case and, in contrast to the single blow in *Alla*, Moran choked Kidis and struck two to seven blows. Moran's conduct in beating and choking a compliant arrestee merits an award greater than the $100,000 and $150,000 awards provided for in those cases.

---

[4]The Court concludes that inflation is an appropriate factor to consider when determining whether a punitive damage award is unconstitutionally excessive. Punitive damages are intended to "punish the defendant and to deter future wrongdoing." *Cooper Industries, Inc. v. Leatherman Tool Group, Inc*., 532 U.S. 424, 432 (2001). In order for previous cases to provide guidance and fair notice about the appropriate amount of punitive damages, inflation should be considered to fully understand the previous award's punitive and deterrent effect. $125,000 in 2018 is not the same as $125,000 in 1988.

[5]All inflation calculations were done using the Bureau of Labor Statistics' Consumer Price Index Inflation Calculator (https://data.bls.gov/cgi-bin/cpicalc.pl).

Considering Moran's reprehensible conduct (as determined by the jury), the above case-law awards, and the effect of inflation, the Court concludes that Moran had fair notice that he would be subjected to a punitive penalty on the order of $200,000. Thus, the jury's award is not unconstitutionally excessive and the Court will not order a remittitur or a new trial on this basis.

**II.     Rule 60(b)(1)**

In his motion, Moran also attempts to re-litigate the qualified immunity argument he raised in his motion for summary judgment. He does so under the guise of Fed. R. Civ. P. 60(b)(1).[6]

Rule 60(b)(1) provides, "[o]n a motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for...mistake, inadvertence, surprise, or excusable neglect." "Such a motion is intended to provide relief to a party in only two instances: (1) when the party has made an excusable litigation mistake or an attorney in the litigation has acted without authority; or (2) when the judge has made a substantive mistake of fact or law in the final judgment or order." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 489 (6th Cir. 2000). Further, a party may not use a Rule 60(b) motion as "as a technique to avoid the consequences of decisions deliberately made yet later revealed to be unwise." *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989). "Rule 60(b) does not allow a defeated litigant a second chance to convince the court to rule in his or her favor..." *Jinks v. Allied Signal, Inc.*, 250 F.3d 381, 385 (6th Cir. 2001) (citation omitted). And the party seeking to invoke Rule 60(b) bears the burden of establishing that its prerequisites are satisfied. *Id.* at 385.

---

[6]Moran titles this section of his brief as "Judicial Relief under Federal Rules 59 or 60 is Required where the use of excessive force was plainly not established by the evidence presented at trial," but does not mention Rule 59 at any point in the body of his argument. Thus, the Court construes this argument as being brought only under Rule 60(b)(1).

12

Moran does not argue that he made an excusable litigation mistake, or that his attorney acted without authority. And he does not explain how the Court made a substantive mistake of fact or law in entering a judgment consistent with the jury's verdict. He simply argues that he is entitled to qualified immunity, then states "[a]ccordingly, this Court must set aside the judgment against Officer Moran under Rule 60(b)(1) or, at a minimum, order a new Trial." This *non sequitur* does not establish that Moran is entitled to relief under Rule 60(b). It is clear that Moran is attempting to use Rule 60(b) to avoid the consequences of his decision to not move for judgment as a matter of law or a directed verdict at the end of Kidis's proofs.

Even if Moran's qualified immunity argument was properly before the Court, it is meritless. "It is well-established that individuals have a constitutional right to be free from excessive force during an arrest." *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606 (6th Cir. 2006). "A police officer uses excessive force in arresting a suspect if his actions are objectively unreasonable given the nature of the crime and the risks posed by the suspect's actions." *Smith v. Stoneburner*, 716 F.3d 926, 933 (6th Cir. 2013).

Based on the evidence presented at trial, the jury was entitled to conclude that Moran intentionally and unnecessarily beat and choked a compliant Kidis. Officers may not use knee strikes or punches to subdue a suspect who, like Kidis, is not resisting. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641-42. (6th Cir. 2015). Nor may they deliver "unjustified and gratuitous" punches to a neutralized suspect's head. *Baker*, 471 F.3d at 607. And Moran's statements to Kidis indicate that his purpose was not to subdue, but to punish. *Id*. Thus, the evidence presented at trial did not establish that Moran is entitled to qualified immunity as a matter of law.

13

## CONCLUSION

For these reasons, the Court **DENIES** Moran' motion for remittitur or a new trial. (ECF No. 125).

**IT IS SO ORDERED.**

Dated:  April 16, 2019	s/ Sean F. Cox
	Sean F. Cox
	U. S. District Judge